MARY ERICKSON, Appellee, v. J. H. JOHNSON, Appellant.

EVIDENCE: Writings—Parol Explanation. Evidence purely explan-
1  atory of the signing of a writing (an assessment roll) by one
   claiming ownership of land is held not contradictory of the
   writing.

HUSBAND AND WIFE: Deed—Release of Dower—Non-liability on
2  Covenants. A husband or wife signing a deed for the sole pur-
   pose of releasing inchoate dower is not bound by the covenants
   of said deed. (Sec. 2921, Code, 1897.)

TENANCY IN COMMON: Ouster—What Constitutes—Adverse Pos-
3  session—Statute of Limitation. The statute of limitation does
   not begin to run in favor of one cotenant and against another
   cotenant until actual ouster. Any act or conduct signifying inten-
   tion to occupy and enjoy the land exclusively, of which the tenant
   out of possession has knowledge, express or implied, amounts to
   an ouster.

   PRINCIPLE APPLIED: A husband, shortly before his death,
   for sufficient consideration gave his wife a quitclaim deed to a
   farm, of which deed the defendant had actual notice. Seven years

before this, the husband, under some arrangement in which the wife had no part, though she released dower, had given the defendant a deed to one half of the farm. The husband and wife had lived on the farm many years before his death. After his death, the wife continued in possession, at once recorded her deed, actively managed the farm, built and rebuilt improvements, some of the materials for which she bought of defendant, and for all of which she paid. She tiled the land, paid all ordinary and drainage taxes (as her husband had done before his death) and also the principal and interest on a $2,000 loan, and was the reputed owner of the land, as her husband had been prior to his death. Defendant lived within a mile and a half of the farm. She informed defendant, soon after her husband's death, that she owned the farm. Defendant never demanded or received any rent or made any inquiries in regard to the farm and the expense attending it. Defendant recorded his deed ten years after the husband's death, or seventeen years after its execution. *Held,* the facts constituted an ouster, and the statute of limitation, a bar.

*Appeal from Hamilton District Court.*—HON. R. M. WRIGHT, Judge.

MONDAY, MAY 10, 1915.

REHEARING DENIED TUESDAY, OCTOBER 5, 1915.

ACTION to quiet title to 160 acres of land in Hamilton County, Iowa. There was a decree for plaintiff, and defendant appeals.—*Affirmed.*

*Wesley Martin,* for appellant.

*G. D. Thompson* and *F. J. Lund,* for appellee.

PRESTON, J.—1. The facts in this case, as shown by the undisputed evidence, or satisfactorily established by the evidence, are, substantially: The plaintiff is the widow of Peter Erickson. He died October 8, 1899. For about two years before his death, he had been in poor health. A few days before his death—to be exact, September 23, 1899—he executed and delivered a quitclaim deed to his wife, conveying the 160 acres in controversy, which was recorded October 12, 1899. The deed recites that the consideration is love and affection

and $1.00. At the time the deed to plaintiff was executed, Peter stated to the notary that he wanted plaintiff to have control of the land after his death; that he was sick, and didn't expect to get well. Before her marriage, plaintiff had worked out and saved about $800 of her wages, which was invested in the land in controversy when it was purchased and taken in the name of her husband. After their marriage, she helped make the hay, helped with the corn and harvest, and she testifies—over objection, however, that it was hearsay—that he gave the land to her because she had helped him, and on account of the money that he got from her.

The defendant claims title to an undivided one half of said land under a warranty deed executed to him by plaintiff's husband, in which plaintiff joined, relinquishing her right of dower. This deed is dated December 13, 1892, but was not recorded for nearly seventeen years thereafter, or on August 9, 1909. The deed was kept by the defendant in his safe with other papers. Defendant claimed that he agreed with Peter Erickson not to record the deed because, as he says:

"We thought both of us it would be necessary to renew the loan on the land and by not putting it on record we should save the expense in regard to bringing the abstract up, so that everything would go in the same name it was previous. I was merely to hold it until these matters were settled up."

By cross-petition, the defendant asked that his title be quieted, and he also pleaded his deed as an estoppel. Plaintiff is now nearly seventy years of age. She was born in Sweden and came to this country about thirty-two years ago. During substantially all that time, she has lived upon this land. She and her husband settled upon the land and built a small one-room house thereon, and there was a kind of a shed for the horses. Plaintiff continued to live with her husband on the farm until the time of his death, and, as stated, by reason of the physical condition and the habits of her husband, plaintiff was required to, and did, perform labor upon the farm. When

the husband died, there were four children. The oldest boy was sixteen. After the husband's death, the mother, with her children, continued to reside upon the land. She and the boys did the work on the farm and she looked after the business of the farm. Soon after her husband's death, she built a barn at an expense of $300, and a corncrib. The barn was destroyed by cyclone and she built another at a cost of $500, and a double corncrib and granary at a cost of $500. She paid for all the improvements. A part of the material was purchased at the town of Stratford, and some of it she purchased of the defendant, paying him therefor.

A drainage district was established across this land and notices of its establishment and the assessment were published in the Stratford paper, the notices describing the land as being in plaintiff's name. An assessment of $524 was levied against the land, which she paid.

The land was situated about a mile and a half east of the town of Stratford. She put in and paid out for about five hundred rods of tile on said land. She paid the taxes on the land after the death of her husband, and her husband paid the taxes prior to that time. Defendant claims that he paid, on one or two occasions, a few dollars on the taxes, but we are satisfied from the record that the taxes were paid, as above stated, by plaintiff and the husband. She paid the interest on the $2,000 loan obtained by her husband on the premises and made payments of the principal until she had reduced the amount of the loan to $1,100, when she acquired a new loan for that amount, giving a mortgage on the premises, and she furnished an abstract of title showing that the title to the premises was in her. She afterwards paid the $1,100 mortgage. The banking business was done at the Stratford bank. During all the time of these transactions from the date of her deed in 1899, the record showed the title to the land to be in plaintiff, up to the time that defendant recorded his deed, in 1909. The $1,100 mortgage given by plaintiff was recorded in Hamilton county, as was the prior mortgage of

$2,000. The cashier of the bank testified that for nineteen years prior to this action, he dealt with plaintiff the same as he dealt with any other owner of real estate. After the death of her husband, plaintiff was the reputed owner of the land. Other witnesses testify that Peter Erickson was the reputed owner of the land up to the time of his death. At the time Peter executed the deed to plaintiff, he claimed to be the owner of the land. Plaintiff and other witnesses testify that defendant never claimed any interest in the land until about the time he placed his deed upon record, in 1909. Witnesses testified that defendant and plaintiff's husband were on intimate terms and that witnesses had seen them drinking together, and one witness testifies that defendant furnished whisky to Peter Erickson. Defendant says he does not remember furnishing the whisky, but admits that they did drink together, but says that he never took advantage of Erickson. Plaintiff's daughter says she never heard her father refer to the place in any other way than that it was his, and after her father's death, she heard her mother talk about the place and refer to it as her farm; that soon after her father's death, she was in defendant's store with plaintiff and heard a conversation between plaintiff and defendant; that the subject of what her father owed defendant was brought up; that defendant did not mention the amount owed; that her mother referred to the land in controversy as her farm and told the defendant that she had the mortgage to pay off and improvements to make on the farm; that plaintiff paid defendant some money; that she paid a note which defendant had signed with plaintiff's husband as security; that she never heard defendant mention owning the farm or any part of it. Another witness testifies that, a year or such a matter after Peter died, he heard a conversation between plaintiff and defendant, in which defendant asked the plaintiff to pay some of her husband's account, and plaintiff told defendant that she could not pay just then, because she had to pay off the mortgage and the taxes. At one time, one Swanson informed plaintiff that he

had heard that defendant had helped her husband in some way and that he might have some claim against the farm, and advised Mrs. Erickson to see about it. Plaintiff went to a Mr. Drug and showed him her deed from her husband. Defendant was sent for and Mr. Drug showed Mr. Johnson plaintiff's deed and asked him what he had to show. Johnson stated that he had a deed and went to get it, but he never returned. Plaintiff testifies that she then thought it was all right and did not examine any more.

Plaintiff learned to read the Swedish language a little, but could not read English until five or six years prior to the trial. At the time the deed to defendant was given, the plaintiff was not at defendant's place, and she did not see defendant; she did not remember going before the notary to acknowledge signing the paper; she was not present when the deal for the deed to defendant was made; she had no knowledge of the transaction between her husband and the defendant. Her signature, however, to defendant's deed is not disputed.

Defendant lived at Stratford and had been in the hardware and implement business there for thirty years or more. He was well acquainted with plaintiff's husband in his lifetime and they had many deals together. Defendant assisted Erickson by signing notes with him as surety. Defendant owned land near the land in controversy; he did his banking business at the same bank that plaintiff and her husband did their banking business. Peter paid defendant money on account and paid up some of the old debts on account, and notes which defendant had signed with him, and when he would pay such notes he would exhibit them to defendant and show that they had been paid; some of them were turned over to defendant. Within a month or two after her husband died, plaintiff paid defendant $100 on account of her husband's indebtedness to defendant, and other amounts within a short time to apply on account. She claims she paid all he asked, but that defendant did not make any itemized account

of money owing him from plaintiff's husband. Defendant never was on the 160 acres in controversy but once during the time that Peter Erickson lived there, and he was never on the place after Peter's death until 1909, about the time he put his deed of record. At that time, he told plaintiff that he had received a deed from Peter Erickson. Defendant never talked with plaintiff about the improvements or the taxes before that nor about the tiling. She never gave defendant any share of the crops. He never asked her for rent, and she never paid him any rent. Defendant makes some claim in regard to this, but it will be referred to later. Defendant never made any inquiry about the mortgages that were on the place. When the cyclone blew the barn away, he never made any inquiry concerning it. He never asked about the orchard that was being planted. Defendant knew about the construction of the drainage ditch, but says he did not know anything about who paid for it; that he never made any inquiry about it nor paid any attention to it; that he did not find out whether the mortgages on the farm had been paid or not; he never made any inquiry and did not know anything about it; he never made any inquiry to see whether the taxes on the land were paid or not.

We have not attempted to set out all of the testimony, but the main points. We shall now refer to other circumstances relied upon by the defendant as being against plaintiff's claim that she was in good faith claiming to own the land. In the assessment roll for the year 1911, signed by plaintiff, it shows that the land belongs to her and J. H. Johnson. It will be noticed that this was after defendant's deed was placed of record, in 1909. An additional abstract has been filed by plaintiff, and it is denied by defendant. The transcript has been certified, and we have been compelled to refer to the transcript on several points. In regard to the assessment roll just referred to, the transcript shows the following in the testimony of plaintiff:

1. EVIDENCE: writings: parol explanation.

"Q. You signed your name there? A. Yes, sir, that is mine. Q. Now I see the name of J. H. Johnson in here. A. Yes, sir, that is here. Q. Did you have any talk with the assessor about that? A. Yes, sir, I did. I told him I didn't know how it came in there. Q. And what did he say to you? A. Well, he said he was obliged to put it in on account it was on the Webster books. That is what he told me. Q. And that is the way you signed it? A. Yes."

Defendant objected to this testimony because it contradicted written declarations by parol, but we think it was proper by way of explanation.

The defendant did testify in chief that plaintiff after the death of her husband, agreed to pay him $185 a year rent and that she had paid $100 on the rent under that agreement. We shall not attempt to set out defendant's testimony in detail, but his testimony is very unsatisfactory, and it is contradictory and inconsistent with his conduct, and inconsistent with itself. He admits that $100 was paid by her but once, and this was November 28, 1899, less than two months after plaintiff's husband died, and when there could be no rent due for the use of the premises after the death of Mr. Erickson. He finally admits, on cross-examination, that she never did pay him a cent of rent, but says that she promised to. The receipt for this $100 was produced and offered in evidence. It is signed by defendant and reads: "Received of Mary Erickson one hundred dollars to apply on account of Peter Erickson." Plaintiff admits the payment of this money and says it was a part payment on her husband's debts to defendant, and denies that she ever paid any rent or promised to do so. Again, on the trial, defendant attempted to give a detailed statement of the consideration for the deed and produced a statement in which are itemized the amounts he claimed he paid for the half interest in the land. It is immaterial, perhaps, as to the matter of adverse possession, what he paid, but we shall refer to this matter briefly to show some of the con-

flicting statements made by the defendant with reference to these alleged payments. This statement was made out by defendant just prior to the commencement of the trial. One of the items is a $600 note, one half of which defendant claims he paid. Plaintiff exhibited this note at the trial in her possession. Witness Drug testified that he paid the $600 note from the proceeds of the $2,000 loan and produced receipts and correspondence so showing. In the statement are two McAllister notes, or items in regard to a McAllister note which he claims he paid, but he admits that these are duplicates, or that one is a renewal of a part of the other, and that one of them ought not to be charged. Some of the items in this account are prior to the time the deed was made to defendant. Another item in this exhibit is an item in which he claims he paid Daniels one half of $98.33. He is not certain about it. The record shows in regard to this item:

"Q. And now isn't it a fact that when Mr. Erickson came to pay the $98.33 note, he had to borrow part of the money to do that? A. I suppose that was the way of it. We borrowed the money together and signed the note together. Q. And didn't he, when he paid the balance of that note, bring the note to you, and these notes to you, to show you that they had been paid? A. Well, that must be the way because—I must have paid my share of it because—Q. Well you don't have any recollection, do you, Mr. Johnson, that you paid your share? A. Well, I can't recollect. I don't believe I would have had these notes in my possession unless I had paid my share."

Some of the items in this statement have not been so successfully refuted by plaintiff as those just referred to. It is possible that defendant did assist Erickson in the purchase by Erickson of the land.

Defendant testifies that at different times he had conversations with plaintiff in which they talked of dividing the

land, and that she wanted the north part where the buildings were; but this is denied by Mrs. Erickson.

There may be some other matters not specifically noticed, but, from the entire record, we are satisfied that the facts are established substantially as we have heretofore given them. It is very clear to us that the conduct of the defendant was not that of a man who owned an undivided half interest in 160 acres of good farming land.

2. It is contended by appellant that the deed executed by Peter Erickson and his wife, the plaintiff, estops her from afterwards claiming the land adversely to the defendant, citing *Garst v. Brutsche*, 129 Iowa 501, 504. We

2. HUSBAND AND WIFE: deed: release of dower: non-liability on covenants.

think a sufficient answer to this is that plaintiff was not a grantor in the deed to defendant. The title was in her husband, and she simply signed it with her husband to relinquish her dower right. At that time her dower right was inchoate. She was not bound by the covenants of warranty in the deed, nor is such a deed a bar to a title subsequently acquired by her. See Sec. 2921, Code of 1897, and Sec. 1937, Code of 1873; *Schaffner v. Grutzmacher*, 6 Iowa 137; *Thompson v. Merrill*, 58 Iowa 419; *Lyon v. Metcalf*, 12 Iowa 93. Plaintiff is not claiming the title to the land in controversy as the widow of Peter Erickson, deceased, but claims under her deed.

3. It is next contended by appellant that a warranty deed reciting a valuable consideration cannot be shown by parol to be without consideration, citing cases. As bearing somewhat upon this point, see *State Bank of Stratford v. Young*, 159 Iowa 375, 385, which states the general rule that the recitals of a written instrument as to the consideration are not conclusive, and it is competent to inquire into the consideration, and to show by parol what the real consideration was. However, we think it unnecessary to determine that point in this case, because other points discussed are decisive.

4. It is also a contention of appellant that one going into possession under a quitclaim deed from a tenant in common

does not thereby assert adverse possession as against the other

**3. TENANCY IN COMMON: ouster: what constitutes: adverse possession: statute of limitations.**

tenant in common so as to set the statute of limitations in motion, and that where, as in the case at bar, the evidence shows that defendant holds an undivided one half interest of the land under a warranty deed made by plaintiff and her husband, which deed recites a consideration of $1,800, the statute of limitations would not run against the defendant without an actual ouster by the plaintiff, and there is no pretense that such ouster occurred.

Plaintiff's possession alone would not ripen into title by adverse possession. The evidence shows that plaintiff in good faith made improvements on the land, used and occupied it as her own and claimed it as her own under the deed from her husband. This deed was color of title, and she also claimed to be the owner thereof and thereunder, so she had both color of title and claim of right. She was informed when her deed was delivered to her that her husband owned the whole of the land, and she believed at the time she received the deed that he owned the farm and that he was conveying to her all of the title thereof. Her deed was recorded soon after it was delivered, and she told defendant it was her farm. These are only some of the circumstances tending to show that she was in good faith claiming to be the absolute owner, and as bearing on the question of defendant's notice or knowledge thereof.

Defendant exercised no acts of ownership and made no claim for more than ten years. He had notice that plaintiff was so claiming to be the absolute owner of the land. The evidence has already been referred to and will not be now repeated. Under the evidence, we think there was an ouster. As stated in some of the cases, express notice does not seem to be necessary, but there must be such acts of repudiation as to bring home to the grantee knowledge of the fact that a disclaimer is made. The evidence is sufficient to show not only that plaintiff, but also her husband, remained in possession of

the land after the execution of the deed to defendant, and that they repudiated, disclaimed and openly asserted their own title in hostility to any interest claimed by defendant under his deed. As stated, the evidence shows that defendant had actual notice of plaintiff's claim. Some of the cases go so far as to hold that where possession is so open and notorious as to raise a presumption of disclaimer of the title, actual notice need not be shown, and that disclaimer of the title of the defendant and ouster may be implied from open and notorious possession. *McClenahan v. Stevenson*, 118 Iowa 106; *Laraway v. Larue*, 63 Iowa 407; *McBride v. Caldwell*, 142 Iowa 228.

We shall not attempt to review the cases, but some of them hold that where, as in this case, a person takes possession of land under a deed, the fact that he pays the taxes, breaks up the land, tiles the land, erects buildings and makes improvements thereon, cultivates the land, year after year, pays off the mortgages, mortgages and remortgages the premises, makes application for mortgages in which he claims absolute ownership, pays ditch taxes and openly claims to be the owner of such land for a period of ten years, with the knowledge of a co-tenant, such possession is adverse, and the statute of limitations runs as against such co-tenant. See *Laraway v. Larue, supra; Casey v. Casey*, 107 Iowa 192; *Blankenhorn v. Lenox*, 123 Iowa 67; *Knowles v. Brown*, 69 Iowa 11.

Appellee contends that where a party unduly sleeps on his rights to the prejudice of another, he is estopped from afterwards asserting his rights, citing *McBride v. Caldwell*, 142 Iowa 228; *Iowa Railroad Land Co. v. Fehring*, 126 Iowa 1; *Bullis v. Noble*, 36 Iowa 618; *Lucas v. Hart*, 5 Iowa 415; *Foster v. Bigelow*, 24 Iowa 379; *Schafer v. Wilson*, 113 Iowa 475, 479; *Ross v. Ferree*, 95 Iowa 604. But, in view of the conclusion we have reached on other points heretofore discussed, we deem it unnecessary to discuss or determine this point as applied to the facts in this case.

The appellant cites *Goulding v. Shonquist*, 159 Iowa 647.

But in that case, the party claiming the title went into possession as a mere trespasser, without any color of title or claim of right, and with no basis whatever for such a claim, and it was held that, under such circumstances, possession alone for the statutory period was not sufficient.

Other points are referred to, but those we have noticed are controlling. We reach the conclusion that the decree of the district court was right, and it is, therefore—*Affirmed.*

DEEMER, C. J., WEAVER and EVANS. JJ., concur.